**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**NORTHERN DIVISION**

BROWN GOLDSTEIN LEVY LLP, et al.,

        Plaintiffs,

v.                            CIVIL ACTION NO.   1:20-cv-01313

FEDERAL INSURANCE COMPANY,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Defendant Federal Insurance Company's (hereinafter referred to as "Chubb") Motion to Dismiss, (ECF No. 13), Plaintiffs Brown Goldstein Levy LLP's (hereinafter referred to as "BGL") and Joshua Treem's (collectively "Plaintiffs") Motion for Partial Summary Judgment, (ECF No. 20), and Chubb's Cross-Motion for Summary Judgment, (ECF No. 40).   For the reasons explained more fully below, the Court **GRANTS** Chubb's Motion to Dismiss and **DENIES AS MOOT** Plaintiffs' Motion for Partial Summary Judgment and Chubb's Cross-Motion for Summary Judgment.

## I.    BACKGROUND

This case arises out of a dispute concerning the scope of coverage under a lawyers professional liability insurance policy (the "Policy") issued by Chubb to BGL.   (ECF No. 1 at 1, ¶ 2.)   As discussed in greater detail below, the parties' dispute in this case concerns four events arising from a federal grand jury investigation of Treem and Kenneth Ravenell—a former client of Treem and BGL—that Plaintiffs allege constitute "Claims" within the scope of coverage under

the Policy.   Before the Court outlines the factual circumstances surrounding these events, a brief examination of the Policy provisions relevant to the resolution of the pending motions is appropriate.

   *A.   The Policy*

   BGL obtained the Policy from Chubb on November 24, 2018 for professional liability insurance coverage for the Policy Period from November 21, 2018 to November 21, 2019.   (ECF No. 1 at 5, ¶ 18.)   The Insuring Clause of the Policy requires Chubb to "pay Loss on behalf of an Insured on account of any Claim first made against such Insured during the Policy Period . . . for a Wrongful Act committed by the Insured before or during the Policy Period."   (ECF No. 13-3 at 3.)   An "Insured" is defined as "the Firm and any Insured Person."   (*Id.* at 3.)   An "Insured Person" includes "any natural person . . . who was, now is or shall become a partner . . . of the Firm."   (*Id.* at 4.)   Thus, Treem—as a partner of BGL—was an "Insured Person" within the meaning of the Policy.

   The Policy defines "Claim" as:

   (1)   any of the following:

        (a)   a written demand or written request for monetary damages or non-monetary relief;

        (b)   a written demand for arbitration;

        (c)   a civil proceeding commenced by the service of a complaint or similar pleading; or

        (d)   a formal civil administrative or civil regulatory proceeding (including a disciplinary or grievance proceeding before a court or bar association) commenced by the filing of a notice of charges or similar document or by the entry of a formal order of investigation or similar document,

against an Insured for a Wrongful Act, including any appeal therefrom.

(*Id.* at 3.)   The parties agree that the events Plaintiffs allege constitute "Claims" could only fall under Section (1)(a) of the Claim definition, which concerns "written demand[s] or written request[s] for monetary damages or non-monetary relief."   (ECF Nos. 13-1 at 11–12, 20-1 at 15.) The scope of the parties' dispute is further limited by their agreeance that the events did not involve "monetary damages" within the meaning of Section (1)(a).   (ECF Nos. 13-1 at 11–12, 20-1 at 15.) Consequently, the pertinent issue with respect to whether the events alleged by Plaintiffs constitute "Claims" triggering coverage under the Policy is whether they constitute "written demand[s] or written request[s] for . . . non-monetary relief."   (ECF No. 13-3 at 3.)

"Loss" is defined by the Policy as "the amount that an Insured becomes legally obligated to pay as a result of any covered Claim, including but not limited to damages . . . , judgments, settlements, prejudgment and post-judgment interest and Defense Costs."   (*Id.* at 5.)

The Policy defines "Defense Costs" as "that part of Loss consisting of reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses . . . incurred in defending any Claim[.]"   (*Id.* at 4.)

Finally, "Wrongful Act" is defined by the Policy as "any actual or alleged act, error or omission committed, attempted, or allegedly committed or attempted, solely in the performance of or failure to perform Professional Services by the Firm or by an Insured Person acting in his or her capacity as such on behalf of the Firm."   (*Id.* at 6.)

### B.  Factual Background

With these definitional provisions in mind, the Court now turns to the events Plaintiffs allege constitute "Claims" within the meaning of the Policy.   As outlined below, Plaintiffs offer

four events they contend constitute "Claims" within the meaning of the Policy: (1) the Ravenell Conflict Letter; (2) the Search Warrant and Subsequent Lawsuit; (3) the Target Letter and Target Conflict Letter; and (4) the Government's demand that Treem notify other clients of potential conflicts arising from the Target Conflict Letter.

### 1. The Ravenell Conflict Letter

First, Plaintiffs allege that a Claim arises from a letter sent by the Government in January of 2019 advising Treem of "multiple nonwaivable conflicts of interest" arising from his status as a "subject" of a federal grand jury investigation into Ravenell's conduct that precluded his representation of Ravenell in connection with the ongoing investigation (the "Ravenell Conflict Letter"). (ECF No. 1 at 11, ¶ 46.) Several years ago, the Government initiated a federal grand jury investigation into alleged criminal conduct committed by Ravenell. (*Id.* at 2, ¶ 3.) The Ravenell Conflict Letter notified Treem—who, at the time, represented Ravenell—that he was "a subject of the investigation" and that his "conduct [was] within the scope of the grand jury's investigation" of Ravenell. (*Id.*; ECF No. 13-4.) Because Treem was identified as a subject of the grand jury's investigation, the Government advised Treem that "there [were] multiple nonwaivable conflicts of interest that prevent[ed] [him] from continuing to represent [] Ravenell in connection with the ongoing grand jury investigation." (ECF No. 13-4.) The Ravenell Conflict Letter stated that these conflicts "warrant[ed] [Treem's] recusal and disqualification from further representation of [] Ravenell." (*Id.*)

Following receipt of the Ravenell Conflict Letter, Treem promptly retained counsel to represent him in connection with the Government's investigation, including the Government's position that Treem could no longer represent Ravenell. (ECF No. 1 at 12, ¶ 47.) Additionally,

BGL and Treem retained ethics counsel to advise them with respect to the effect, if any, the Government's investigation and the Ravenell Conflict Letter might have on BGL's other clients. (*Id.*)

### 2. The Search Warrant and Lawsuit

Second, Plaintiffs contend that a Claim arises from the execution of a search warrant issued in June of 2019 for confidential, privileged documents at BGL's office, which were purportedly related to the Government's ongoing investigation of Ravenell and Treem (the "Search Warrant"). (*Id.* at 2, ¶ 4.)  In June of 2019, the Government applied for a warrant authorizing a search of BGL's office in connection with the grand jury investigation of Ravenell and Treem.  (*Id.* at 7, ¶ 30.)  In pursuit of the Search Warrant, the Government represented that probable cause existed "to believe that [Treem] engaged in criminal conduct with [Ravenell] during the time period in which [Treem] and [BGL] were representing [Ravenell]."  (*Id.* at 8, ¶ 31.)  On June 13, 2019, a United States Magistrate Judge issued the Search Warrant, based upon a finding of probable cause, to search and seize documents located at BGL's office in connection with the grand jury investigation of Ravenell and Treem.  (*Id.* at 8, ¶¶ 31–32.)  The Search Warrant was executed on June 18, 2019.  (*Id.* at 8, ¶ 33.)

Plaintiffs claim the documents seized by the Government far exceeded the limited scope of its investigation of Ravenell and Treem.  (*Id.* at 8, ¶ 34.)  Plaintiffs offer as an example the Government's seizure of tens-of-thousands of BGL emails containing privileged materials and other client confidences that bore no conceivable relationship to the grand jury's investigation. (*Id.*)  Particularly, the Government seized all of Treem's emails, regardless of their relation to

Ravenell or relevance to the ongoing investigation.[1]   (*Id.* at 8, ¶ 35.)   Plaintiff alleges that the Government "demanded" the cooperation of BGL employees while it executed the Search Warrant.   (*Id.* at 9, ¶ 38.)   BGL and its attorneys objected to the Government's seizure of these items, but the Government refused any requested limitations.   (*Id.* at 9, ¶ 39.)

In response to the Government's refusal of their requested limitations, BGL retained legal counsel, to "defend" BGL and Treem, and to "defend" BGL's clients' confidences.   (*Id.* at 10, ¶ 43.)   BGL subsequently filed suit against the Government, moving on an emergency basis for a temporary restraining order and preliminary injunction to halt the Government's review of the seized documents and for a separate order for the return of BGL's and Treem's seized materials. (*Id.* at 10–11, ¶ 43.)   Plaintiffs contend that, only after extensive and costly litigation, the United States Court of Appeals for the Fourth Circuit ordered that a federal magistrate judge or an appointed special master—and not the Government's so-called "filter team"—were to (a) review all seized materials, (b) identify and return to BGL all seized materials unrelated to Ravenell, and (c) conduct a privilege evaluation of all remaining materials.   (*Id.*)   Plaintiffs contend they continued to incur legal fees and expenses associated with the Search Warrant after the Fourth Circuit's order, including costs related to the special master's review, and costs related to numerous disputes between BGL and the Government regarding the applicability of the attorney-client privilege and crime-fraud exception to documents under review.   (*Id.* at 11, ¶ 44.)

---

[1] The Government allegedly seized in excess of 37,000 emails from Treem's inbox, of which only 62 emails were from Ravenell or contained Ravenell's last name.   Plaintiffs also allege that the Government seized in excess of 15,000 emails from Treem's outbox, of which only 54 emails were sent to Ravenell or contained Ravenell's last name. Thus, Plaintiffs allege that "of the approximately 52,000 emails seized from Treem's inbox and outbox, 0.2% were to [Ravenell], from [Ravenell], or contained [Ravenell's] last name."   (ECF No. 1 at 8, ¶ 35.)

3.  The Target Letter and the Target Conflict Letter

Third, Plaintiffs assert that a Claim arises from two additional letters sent by the Government: (1) a letter dated June 18, 2019 advising Treem that he was "a target of the ongoing criminal investigation" of Ravenell and that "the Grand Jury ha[d] substantial evidence linking [him] to the commission of crimes (the "Target Letter"), (ECF No. 13-5); and (2) a letter dated June 28, 2019 notifying Treem that his "representation of [a] defendant in [a] related civil case . . . presents a possible conflict of interest with [his] personal interests as a target of [the] federal grand jury investigation" (the "Target Conflict Letter"), (ECF No. 13-8).

The Target Letter—which was sent to Treem the same day the Government executed the Search Warrant—advised Treem's legal counsel that his status as a "subject" of the grand jury investigation had been elevated to a "target" of the investigation and that "the Grand Jury ha[d] substantial evidence linking [him] to the commission of crimes."   (ECF No. 13-5.)   The Target Conflict Letter advised Treem that his "representation of [a] defendant in [a] related civil case, including advising him with respect to his required cooperation, present[ed] a possible conflict of interest with [his] personal interests as a target of [the] federal grand jury investigation."   (ECF No. 13-8.)   The Target Conflict Letter further informed Treem of the Government's belief that the defendant "should be advised of the possible conflict so that he may waive the conflict or find new counsel," and that if the "defendant elect[ed] to waive the possible conflict, . . . the waiver should be confirmed in court and on the record."   (*Id.*)   Plaintiffs contend that Treem continues to engage counsel to advise and defend him in connection with the Government's investigation and its purported demands for non-monetary relief.   (ECF No. 1 at 13, ¶ 51.)

4. <u>The Government's Demand That Treem Notify Other Clients of Potential Conflicts Arising From the Target Letter</u>

Similar to the Target Conflict Letter discussed above, on June 28, 2019, another Assistant United States Attorney notified Treem of a separate purported conflict of interest on the same basis as the Target Conflict Letter and demanded that Treem follow the same procedures.  (ECF No. 1 at 12, ¶ 49.)  Plaintiffs allege that the Government has made similar demands on Treem with respect to other clients Treem represents who have proceedings involving the Government.  (*Id.*)  Plaintiffs claim that, as a target—or "putative defendant"—of an ongoing criminal investigation into his alleged conduct, Treem "was left with no choice but to accede to the Government's instructions."  (*Id.*)

*C. Plaintiffs' "Claims"*

Plaintiffs provided Chubb written notice of their Claims for Losses under the Policy, seeking reimbursement of all legal fees and expenses they incurred in connection with what the Complaint describes as the "Search Warrant Claim" and the "Partner Claim."  (*Id.* at 13–14, ¶¶ 52, 54.)  Plaintiffs submitted the Search Warrant Claim to recover "Losses under the Policy in connection with the Government's application for a search warrant, and subsequent raid of [BGL's] office, including the substantial legal fees and expenses [BGL] incurred to secure the return of documents unrelated to the grand jury investigation, and to protect other privileged and confidential client information[.]"  (*Id.* at 13, ¶ 52.)  Plaintiffs submitted the Partner Claim to recover "Losses under the Policy in connection with the Government's criminal investigation of [Treem]," including the Target Letter, the Search Warrant, the Ravenell Conflict Letter, and the Target Conflict Letter.  (*Id.* at 13, ¶ 53.)  In a letter dated March 6, 2020, Chubb confirmed its denial of coverage for the Search Warrant Claim and the Partner Claim.  (*Id.* at 15, ¶ 58.)

8

*D. Procedural Background*

Plaintiffs initiated this action on May 27, 2020, alleging four counts against Chubb in their Complaint.  (ECF No. 1 at 15–23.)   Counts I and II seek breach of contract damages arising from Chubb's denial of coverage for the "Search Warrant Claim," and an order declaring that Chubb (a) wrongfully denied coverage for the Search Warrant Claim, (b) wrongfully refused to advance on a current basis Defense Costs for the Search Warrant Claim, and (c) is liable for BGL's and Treem's attorneys' fees and other expenses incurred in bringing this action.  (*Id.* at 15–19, ¶¶ 60–86.)  Plaintiffs allege that "the Search Warrant Claim . . . arises out of the Government's June 2019 application for, and subsequent execution of, a search warrant at [BGL's] office."  (*Id.* at 15, ¶ 62.)

Counts III and IV seek breach of contract damages arising from Chubb's denial of coverage for the "Partner Claim," and an order declaring that Chubb (a) wrongfully denied coverage for the Partner Claim, (b) wrongfully refused to advance on a current basis Defense Costs for the Partner Claim, and (c) is liable for BGL's and Treem's attorneys' fees and other expenses incurred in bringing this action.  (*Id.* at 19–23, ¶¶ 87–113.)  Plaintiffs allege that "the Partner Claim arises out [of] the Government's investigation of [Treem]," which they contend includes the following "written demands for non-monetary relief": (a) the Target Letter, (b) the Search Warrant, (c) the Ravenell Conflict Letter, (d) the Target Conflict Letter, and (e) the Government's alleged demand that Treem submit potential conflicts and any waivers of conflict to judicial vetting in a hearing before a federal judge.  (*Id.* at 19, ¶ 89.)

Chubb filed its Motion to Dismiss for Failure to State a Claim on July 23, 2020.  (ECF No. 13.)   Plaintiffs filed their Motion for Partial Summary Judgment, (ECF No. 20), and

consolidated Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment and Opposition to Defendant's Motion to Dismiss, (ECF No. 20-1), on September 9, 2020.   Chubb filed its Cross-Motion for Summary Judgment, (ECF No. 40), and Consolidated Reply in Support of its Motion to Dismiss, Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment and Memorandum of Law in Support of Cross-Motion for Summary Judgment, (ECF No. 40-1), on May 21, 2021.   Plaintiffs filed their Consolidated Reply in Support of Plaintiffs' Motion for Partial Summary Judgment and Opposition to Defendant's Cross-Motion for Summary Judgment on June 25, 2021.   (ECF No. 43.)   Chubb filed its Reply in Support of Cross-Motion for Summary Judgment on July 16, 2021.   (ECF No. 46.)   Accordingly, all motions pending before this Court—Chubb's Motion to Dismiss, Plaintiffs' Motion for Partial Summary Judgment, and Chubb's Cross-Motion for Summary Judgment—have been fully briefed and are now ripe for adjudication.[2]

## II.    LEGAL STANDARD

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint.   Fed. R. Civ. P. 12(b)(6).   A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007).   A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.   In applying this standard, a court must utilize a two-pronged approach.   First, it must separate the legal conclusions in the complaint from the factual allegations.   *Ashcroft v. Iqbal*,

---

[2] By order entered October 21, 2021, this case was transferred to the undersigned.   (ECF No. 50.)

556 U.S. 662, 678 (2009).    Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged." *Id.*    Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)).    A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

"Rule 12(b)(6) does not mandate that a district court treat a motion to dismiss as a motion for summary judgment simply because the moving party includes exhibits with its motion." *Pueschel v. United States*, 369 F.3d 345, 354 n.3 (4th Cir. 2004).    It "only requires that a motion to dismiss be treated as a motion for summary judgment when the motion to dismiss or exhibits present matters outside the nonmoving party's pleadings and the district court does not exclude such matters." *Id.*    Nevertheless, a court may consider extrinsic evidence at the 12(b)(6) stage if such evidence "was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity."    *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).    "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual notice . . . ."    *Trigon Healthcare*, 367 F.3d at 234 (4th Cir. 2004) (internal quotations omitted).

Here, the parties have attached several exhibits to their briefing related to Chubb's Motion

11

to Dismiss.   However, insofar as the only exhibits relevant to the Court's disposition of Chubb's motion are the Policy, (ECF No. 13-3), the Ravenell Conflict Letter, (ECF No. 13-4), the Search Warrant, (ECF No. 13-6), the Target Letter, (ECF No. 13-5) and the Target Conflict Letter, (ECF No. 13-8), and because these documents are explicitly referenced and relied upon in Plaintiffs' Complaint, the Court may properly consider these documents without converting Chubb's Motion to Dismiss to a motion for summary judgment.

## III.    DISCUSSION

Three motions are currently pending before this Court: (1) Chubb's Motion to Dismiss, (2) Plaintiffs' Motion for Partial Summary Judgment, and (3) Chubb's Cross-Motion for Summary Judgment.   However, for the reasons explained more fully below, this Court agrees with Chubb that Plaintiffs have failed to state a claim upon which relief can be granted.   Thus, it is unnecessary for the Court to reach the parties' arguments raised in their cross-motions for summary judgment. Accordingly, the Court proceeds with the disposition of this case on the basis of Chubb's Motion to Dismiss.   Insofar as Plaintiffs have failed to state a claim upon which relief can be granted, the Court **GRANTS** Chubb's Motion to Dismiss.

### A.  Interpretation of the Policy

As an initial matter, the parties dispute whether ambiguities in the Policy should be interpreted in Plaintiffs' favor.   Plaintiffs, citing *Megonnell v. United Servs. Auto. Ass'n*, 796 A.2d 758 (Md. 2002), suggest that Maryland law mandates that ambiguities be "interpreted against the insurer and in favor of the insured."   (ECF No. 20-1 at 15.)   Conversely, Chubb, also citing *Megonnell*, argues that "Maryland does not follow the rule that insurance policies should, as a

matter of course, be construed against the insurer. . . . Instead, ordinary principles of contract interpretation apply."  (ECF No. 40-1 at 12.)

> *Megonnell* explains Maryland's rules of construction of insurance contracts as follows:

> "In the interpretation of the meaning of an insurance contract, we accord a word its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense."  In that vein, insurance contracts are construed as ordinary contracts.  Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer.    Instead, ordinary principles of contract interpretation apply. Accordingly, if no ambiguity in the terms of the insurance contract exist, a court has no alternative but to enforce those terms.    "Nevertheless, under general principles of contract construction, if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument*."

*Megonnell*, 796 A.2d at 771–72 (internal citations omitted) (emphasis in original).

Insofar as insurance contracts are to be construed as ordinary contracts, Maryland's objective law of contract interpretation applies to insurance contracts to determine whether any ambiguities exist.  *See Aerotek, Inc. v. Obercian*, 377 F. Supp. 3d 539, 550 (D. Md. 2019). Where the language of the Policy is plain and unambiguous, the Court will presume the parties meant what they expressed.  *Id.* (citing *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985)).   A written contact is unambiguous if, when read by a reasonably prudent person, it is not susceptible to more than one meaning.  *Id.* (citing *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999)).   "If a written contract is susceptible of a clear, unambiguous and definite understanding . . . its construction is for the court to determine."  *Wells v. Chevy Chase Bank, F.S.B.*, 768 A.2d 620, 630 (Md. 2001) (citing *Rothman v. Silver*, 226 A.2d 308, 310 (Md. 1967)).

The meaning of "claim," as used in liability insurance policies, is unambiguous.  *See Fin. Indus. Regul. Auth., Inc. v. Axis Ins. Co.*, 951 F. Supp. 2d 826, 832 (D. Md. 2013); *see also*

13

*Schlather, Stumbar, Parks & Salk, LLP v. One Beacon Ins. Co.*, No. 5:10-cv-0167, 2011 WL 6756971, at *5 (N.D.N.Y. Dec. 22, 2011) (noting that "[c]ourts have found that the term 'claim' as used in liability insurance policies is unambiguous").   Moreover, the Fourth Circuit has found that an insurance policy defining "claim" as "a written demand for monetary or non-monetary relief" was unambiguous.  *SNL Fin., LC v. Phila. Indem. Ins. Co.*, 455 F. App'x 363, 368 (4th Cir. 2011).

Here, "Claim" is defined in the Policy, in relevant part, as "a written demand or written request for monetary damages or non-monetary relief[.]"   (ECF No. 13-3 at 3.)   This language is virtually identical to that which was at issue in *SNL*.   Therefore, consistent with the rulings of this District and the Fourth Circuit, the meaning of "Claim" as it pertains to the Search Warrant Claim and the Partner Claim is unambiguous and is an issue of law for this Court to resolve.   With these interpretive canons framing the Court's examination of the Policy's "Claim" definition, the Court proceeds to analyze whether the Search Warrant Claim or the Partner Claim trigger coverage under the Policy.

B.  *The Search Warrant Claim*

Chubb makes two principal arguments that the Search Warrant Claim does not trigger coverage under the Policy.   First, Chubb contends that the Search Warrant does not constitute "a written demand or written request for non-monetary relief."   (ECF No. 13-1 at 12.) Alternatively, Chubb contends that even if the Search Warrant Claim does constitute "a written demand or written request for non-monetary relief," Counts I and II still fail to state a claim upon which relief can be granted because the costs incurred by Plaintiffs related to the Search Warrant Claim did not seek coverage for amounts "incurred in defending any Claim," but instead for

14

amounts incurred to pursue affirmative claims for relief against the Government.    (*Id.*)    The Court addresses each of Chubb's arguments in turn.

      1.   <u>Written demand or written request for non-monetary relief</u>

Chubb first argues that the Government's application for and execution of the Search Warrant does not fit within the Policy's "Claim" definition.    (*Id.* at 12.)    As explained above, the parties agree that Section (1)(a) of the Policy's "Claim" definition controls the disposition of Chubb's Motion to Dismiss.    In relevant part, Section (1)(a) defines "Claim" as "a written demand or written request for . . . non-monetary relief[.]"    (ECF No. 13-3 at 3.)    Thus, in this respect, Chubb asserts that the Search Warrant Claim is not a "Claim" within the meaning of the Policy because the Government's application for and execution of the Search Warrant was not a "demand or request[;]" was not "for . . . non-monetary relief[;]" was not a "demand . . . against an Insured[;]" and was not for a "Wrongful Act."    (ECF No. 13-1 at 15–22.)

A brief synopsis of the history and purpose underlying the Fourth Amendment's warrant requirement and the process for obtaining a search warrant is instructive to the inquiry of whether the Search Warrant Claim meets the "Claim" definition under the Policy.    The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."    U.S. CONST. amend IV.    Save for a few specifically established and well-delineated exceptions, searches conducted without first obtaining a warrant issued by a neutral judge or magistrate are per se unreasonable under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 356–57 (1967).    Thus, the Supreme Court of the United States has stated a strong preference that searches conducted by law enforcement be undertaken only after obtaining a warrant issued by a neutral and detached magistrate.    *See United States v.*

*Ventresca*, 380 U.S. 102, 106 (1965) ("[T]his Court, strongly supporting the preference to be accorded searches under a warrant, [has] indicated that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.").

The classic statement of the policy underlying the warrant requirement of the Fourth Amendment was explained by the Supreme Court in *Johnson v. United States*, 333 U.S. 10, 13– 14 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.   Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.   When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

Thus, the Fourth Amendment's warrant requirement and the process for obtaining a warrant was not intended to serve as a means by which the Government may obtain any sort of "remedy" or "relief" from an adverse party, but was intended as a protection of the peoples' right to be free from unreasonable searches that are not based upon probable cause.

In light of the policy and historical underpinnings of the Fourth Amendment's warrant requirement, it is clear that the Government's application for and execution of the Search Warrant does not constitute a "written demand or written request for . . . non-monetary relief."   "[I]n the legal context, it is well established that relief means '[t]he redress or benefit, esp. equitable in nature (such as an injunction or specific performance), that a party asks of a court.'"   *RSUI Indem. Co. v. Desai*, No. 8:13-CV-2629-T-30TGW, 2014 WL 4347821, at *4 (M.D. Fla. Sept. 2, 2014)

(quoting Black's Law Dictionary (9th ed. 2004)); *see also Diamond Glass Cos., Inc. v. Twin City Fire Ins. Co.*, No. 06-CV-13105, 2008 WL 4613170, at \*4 (S.D.N.Y. Aug. 18, 2008) (finding that "subpoenas and search warrants do not fit within [the] meaning of the term 'relief'").

The *RSUI* court considered a similar insurance policy that defined "claim" as "[a] written demand for monetary or non-monetary relief[.]"   *RSUI*, 2014 WL 4347821, at \*4.   That case involved a "claims-made Directors and Officers Liability Policy" issued by RSUI to Universal Health Care Group, Inc. ("Universal").   *Id.* at \*1.   Universal maintained that it was the target of an ongoing criminal investigation and, as required under the policy, tendered the defense and indemnity of the criminal investigation to RSUI.   *Id.*   In support of its contention that an active criminal investigation was ongoing, Universal cited a search and seizure warrant, which was executed at Universal's headquarters.   *Id.*   RSUI refused to pay for the defense of the criminal investigation and subsequently filed suit, seeking a declaratory judgment as to its duties under the policy.   *Id.* at 2.

Assuming, *arguendo*, that the warrant constituted a "written demand," the *RSUI* court held that the warrant was not a demand for "relief."   *Id.* at 4.   Relying on the definition of "relief" cited above, the *RSUI* court found that the authorization conferred upon law enforcement by the warrant to search for Universal's documents and things was not "demanded as redress in response to (or as requital of) a wrongful act," but "[a]t best, . . . enabled law enforcement to investigate whether a wrongful act had occurred."   *Id.* at 5.   Therefore, because the search warrant did not constitute "a Claim for a Wrongful Act," the *RSUI* court held that coverage under the disputed policy was not triggered and RSUI had no duty to defend the ongoing criminal investigation of Universal.   *Id.*

Similarly, the court in *Diamond Glass* held that "investigative subpoenas and search warrants are not 'demands for non-monetary relief'" under an insurance policy that defined "Entity Claim" as any "written demand for . . . non-monetary relief . . . against an Insured Entity[.]"  2008 WL 4613170, at *4.  *Diamond Glass* involved a federal investigation into Diamond Glass's business practices, which included a grand jury subpoena to Diamond Glass's Custodian of Records to produce documents and to testify before the grand jury, a grand jury subpoena to Diamond Glass's Vice President for Information Technology to testify before the grand jury, and a search warrant allowing FBI agents to conduct a search of its headquarters and to seize various business records and electronic data storage devices.  *Id.* at *1.  Also relying on Black's Law Dictionary's definition of "relief," the *Diamond Glass* court found that "[g]rand jury subpoenas and search warrants [did] not fit within [the] meaning of the term 'relief' or fall within a reasonable reading of the use of the term in the context of the [p]olicy."  *Id.* at *4.

In the instant action, the Policy's "Claim" definition, which is nearly identical to the disputed policies in *RSUI* and *Diamond Glass*, cannot be reasonably read to include the Search Warrant as "a written demand or written request for . . . non-monetary relief."  Search warrants are not forms of "relief," but rather constitute judicial authorization—based upon a finding of probable cause—to conduct searches of places and things.  This judicial authorization *must* be obtained by law enforcement, save for a few narrow exceptions, prior to the execution of the search to comply with the protections afforded by the Fourth Amendment.  Search warrants are not sought by the Government to redress diminutions of its legal rights or to enforce any legal rights it may possess.   Rather, they are sought by the Government to conduct lawful searches of people, places, and things, and to seize evidence of crimes.

18

This conclusion is further bolstered by a review of the remaining "Claim" definitions included under Section (1) of the Policy, which categorically exclude criminal matters. Section (1)(b) defines "Claim" as "a written demand for arbitration." (ECF No. 13-3 at 3.) To be sure, arbitration is a dispute-resolution process in which the disputing parties choose one or more neutral third parties to make a final and binding decision resolving the dispute. It is a process utilized only in the civil context. Section (1)(c) defines "Claim" as "a *civil* proceeding commenced by the service of a complaint or similar pleading." (*Id.*) (emphasis added). This definition categorically excludes criminal proceedings. Finally, Section (1)(d) defines "Claim" as "a formal *civil* administrative or *civil* regulatory proceeding . . . commenced by the filing of a notice of charges or similar document or by the entry of a formal order of investigation or similar document." (*Id.*) (emphasis added). Again, like Section (1)(c), criminal matters are categorically excluded from Section (1)(d). Accordingly, no reasonable person could read Section (1)(a) of the Policy's "Claim" definition, together with the remaining definitions in Sections (1)(b) through (1)(c), and conclude that the Search Warrant—which was issued in relation to a grand jury criminal investigation of Ravenell and Treem—constitutes a "written demand or written request . . . for non-monetary relief."

Plaintiffs contend that Chubb's arguments that the Search Warrant is not a written demand for non-monetary relief "reflect a fundamental misunderstanding of the search warrant process." (ECF No. 20-1 at 18–19.) In this respect, Plaintiffs argue that "[t]he procedure for obtaining a search warrant mirrors in all relevant respects the procedure for filing a civil complaint for non-monetary (or monetary) relief." (*Id.* at 19.) However, Plaintiffs' attempt to analogize the process for obtaining a search warrant with the filing of a civil complaint is misguided. Civil complaints

are pleadings that initiate civil actions and state the basis for the court's jurisdiction, the basis for the plaintiff's claim, and the demand for relief.   Civil actions are brought to enforce, redress, or protect private or civil rights.   Search warrants are not sought by the Government to enforce, redress, or protect any legal rights, but rather are sought to obtain authorization to search a specified place and to seize evidence.   The two bear no relation and are further distinguished by the observation that search warrants are only issued to collect evidence relating to *criminal* matters.

Plaintiffs also claim that "[t]he only reasonable view of the Search Warrant . . . was that it demanded full cooperation with the Government's collection of emails and documents" from BGL's office.  (ECF No. 20-1 at 20.)   Although the Court declines to address whether the Government's application for and execution of the Search Warrant constitutes a "written demand," still the Search Warrant does not constitute a "Claim" under the Policy because, as explained above, it was not a demand for "non-monetary relief."

Finally, Plaintiffs argue that the Government's application for the Search Warrant sought non-monetary relief "in the form of documents or other materials in [BGL's] possession."   (ECF No. 20-1 at 21.)   Plaintiffs cite several non-binding authorities in support of this contention. *Joseph P. Bornstein, Ltd. v. Nat. Union Fire Ins. Co. of Pittsburgh, PA*, 828 F.2d 242 (4th Cir. 1987) (finding that a grand jury investigation "to gather information" is a government proceeding "seeking nonpecuniary relief"); *Protection Strategies, Inc. v. Starr Indem. and Liab. Co.*, 2013 WL 10724338 (E.D. Va. Sept. 10, 2013) (district court order finding coverage for a search warrant under an insurance policy with a broad definition of "Claim"); *Agilis Benefit Servs., LLC v. Travelers Cas. and Sur. Co. of Am.*, 2010 WL 11595321 (E.D. Tex. Feb. 24, 2010) (federal magistrate judge's report and recommendation finding coverage for a search warrant under an

insurance policy defining "Claim" as "a written demand for . . . non-monetary relief"); *Minuteman Int'l, Inc. v. Great Am. Ins. Co.*, No. 03-C-6067, 2004 WL 603482 (N.D. Ill. Mar. 22, 2004) (unpublished district court memorandum opinion and order finding coverage for expenses related to a SEC investigation, which included a subpoena, under a policy defining "Claim" as "a written demand for monetary or nonmonetary relief . . ." or "a . . . criminal . . . proceeding . . . seeking monetary or nonmonetary relief"); *Syracuse Univ. v. Nat. Union Fire Ins. Co. of Pittsburgh, PA*, 2013 N.Y. Slip Op. 51041(U) (N.Y. Sup. Ct. 2013) (unpublished New York state court opinion finding coverage for costs related to a subpoena under a policy defining "claim" as "[a] written demand for monetary, non-monetary, or injunctive relief," or "[a] . . . criminal proceeding for . . . non-monetary relief").    A review of these authorities, however, reveals critical distinguishing features of the insurance policies considered in those cases from the Policy in the instant action.

Although *Protection Strategies* and *Agilis* each found that search warrants constituted "claims" within the meaning of their respective policies, each case is distinguishable from the instant action.   *Protection Strategies* is distinguishable from the instant action insofar as that case involved a policy which broadly defined "Claim" as any "written demand for monetary, non-monetary, or injunctive relief . . ." and any "judicial, administrative, or regulatory proceeding, *whether civil or criminal*, for monetary, non-monetary or injunctive relief. . . ."   *Protection Strategies*, 2013 WL 10724338, at *2 (emphasis added).   Likewise, the policy considered in *Agilis* also extended the "Claim" definition to include "criminal proceeding[s]."   *Agilis*, 2010 WL 11595321, at *2–3.

Plaintiffs' attempt to equate the instant action to *Bornstein*, *Minuteman*, and *Syracuse Univ.* is also unavailing.   *Bornstein* involved an easily distinguishable, broad insurance policy that

required the defendant to "defend *any* proceeding or suit brought by any government regulatory agency seeking nonpecuniary relief." *Bornstein*, 828 F.2d at 244 (emphasis added). Moreover, the issue in *Bornstein* was whether a grand jury investigation and the proceedings following the plaintiff's indictment fell within the broad policy, which encompassed "proceedings." *Id. Minuteman* and *Syracuse Univ.* each involved cases relating to subpoenas and whether costs related to those subpoenas were covered under their respective policies. *Minuteman*, 2004 WL 603482, at *5–7; *Syracuse Univ.*, 2013 N.Y. Slip Op. 51041(U), at *3–4.

In sum, the Policy in the instant action cannot be reasonably read to include coverage for Plaintiffs' costs related to the Search Warrant. The Government's application for and execution of the Search Warrant did not demand or request "non-monetary relief." The Government did not seek to redress any diminution of its legal rights, nor did it seek any remedy for any harm brought upon it by Plaintiffs in its pursuit of the Search Warrant. Rather, the authorization obtained by the Search Warrant merely enabled the Government to search BGL's office and seize documents and materials related to the grand jury's criminal investigation of Ravenell and Treem in a lawful manner that was consistent with the Fourth Amendment's requirement that searches and seizures be reasonable. As such, because the Search Warrant does not fall within the Policy's definition of "Claim," Counts I and II of Plaintiffs' Complaint relating to the Search Warrant Claim fail to state a claim upon which relief can be granted.

2. Loss: Defense Costs

Chubb alternatively contends that, even if the Search Warrant Claim constitutes "a written demand or written request . . . for non-monetary relief," Counts I and II of Plaintiffs' Complaint still fail because the Search Warrant Claim did not seek coverage for amounts "incurred in

defending any Claim," but instead for amounts incurred to pursue affirmative claims for relief against the Government.  (ECF No. 13-1 at 12.)  Chubb maintains that because the Search Warrant Claim sought "coverage for the costs allegedly incurred to bring an affirmative claim *by* [Plaintiffs] *against* the Government," Plaintiffs incurred no "Defense Costs" that would trigger coverage under the Policy.  (*Id.* at 22) (emphasis in original).

The Insuring Clause of the Policy requires Chubb to "pay Loss on behalf of an Insured on account of any Claim first made *against* such Insured. . . ."  (ECF No. 13-3 at 3) (emphasis added)  Included within the Policy's definition of "Loss" are "Defense Costs."  (*Id.* at 5.)  The Policy defines "Defense Costs" as "that part of Loss consisting of reasonable costs, charges, fees . . . and expenses . . . incurred in *defending* any Claim. . . ."  (*Id.* at 4) (emphasis added).  Moreover, explicit in the Policy's "Claim" definition is the requirement that the "written demand or written request for . . . non-monetary relief" be made "*against* an Insured."  (*Id.* at 3) (emphasis added).

Chubb argues that Plaintiffs' costs in pursuit of an affirmative lawsuit by the Plaintiffs against the Government to obtain a temporary restraining order and permanent injunction "to halt the [G]overnment's review of seized documents" do not constitute "Defense Costs" or "Loss" under the Policy.  (ECF No. 13-1 at 22–23.)  Plaintiffs, however, contend that, beyond voicing objection to the Government's seizure of documents that purportedly bore no relation to the grand jury investigation of Ravenell and Treem, they "had no immediate legal recourse to stop" the Government's execution of the Search Warrant.  (ECF No. 20-1 at 33.)  They assert that "the legal mechanism for limiting an overbroad search warrant [was] to do what [Plaintiffs] did here: file an emergency motion seeking the return of seized documents."  (*Id.* at 33–34.)  Thus,

Plaintiffs claim, "moving to limit the Government's review of seized documents [was] not an affirmative claim against the Government; it [was] a purely defensive measure."  (*Id.* at 34.)

Nevertheless, Plaintiffs' characterization of their lawsuit in response to the Search Warrant as a "purely defensive measure" is futile.  Plaintiff argues that where an Insured is "nominally a plaintiff, but its role is defensive, courts generally conclude that the insured's legal fees are defense costs for purposes of insurance coverage."  (*Id.* at 34–35.)  While it is true that "the authority appears virtually uniform in holding that there is a class of affirmative claims which, if successful, have the effect of reducing or eliminating the insured's liability and that the costs and fees incurred in prosecuting such 'defensive' claims are encompassed in an insurer's duty to defend," the costs of the Search Warrant litigation do not appear to belong to that class.  *Great West Cas. Co. v. Marathon Oil Co.*, 315 F. Supp. 2d 879, 881 (N.D. Ill. 2003).  Specifically, as the court in *Great West* analyzed in detail, the class of covered affirmative claims are those that "could defeat or offset liability."  *Id.* at 882.  The affirmative Search Warrant lawsuit did no such thing.

The authorities Plaintiffs cite are plainly limited to situations where "fees incurred in prosecuting [a] claim" are "inseparable" from the costs that would be incurred from defending the same, suggesting that the affirmative litigation must largely mirror some potential defensive litigation.  *Smart Style Indus., Inc. v. Penn. Gen. Ins. Co.*, 930 F. Supp. 159, 164–65 (S.D.N.Y. 1996).  No such defensive litigation exists in the context of a search warrant.  Indeed, Plaintiffs provide no authority supporting an extension of the limited class of affirmative claims to anything resembling the significant litigation they undertook with respect to the search warrant.  Because that litigation in no way "could defeat or offset liability," the costs incurred by Plaintiffs in its pursuit of that litigation cannot be construed as "Defense Costs," and thus covered "Losses,"

24

within the meaning of the Policy, even if the Search Warrant gives rise to a "Claim" under the Policy.

Because the Search Warrant does not constitute a "written demand or written request for . . . non-monetary relief," and because the costs Plaintiffs incurred with respect to the Search Warrant litigation against the Government do not constitute "Defense Costs" under the Policy, the Court finds that the Search Warrant Claim does not trigger coverage under the Policy. Accordingly, Counts I and II of Plaintiffs Complaint fail to state a claim upon which relief may be granted.   Therefore, the Court **GRANTS** Chubb's Motion to Dismiss with respect to Counts I and II of Plaintiffs' Complaint.

### C.  The Partner Claim

Chubb argues Counts III and IV of Plaintiffs' Complaint with respect to the "Partner Claim" should be dismissed because the criminal investigation of Treem, as a whole, does not constitute a "Claim" under the Policy, and none of the Government's communications to Treem in the course of the investigation satisfy the requirements of Section (1)(a) of the Policy's Claim definition.  (*Id.* at 24.)

#### 1.  The Grand Jury Investigation of Treem

Chubb first argues that Plaintiffs' assertion that the grand jury investigation of Treem, as a whole, constitutes a "Claim" under the Policy is meritless "because the Policy applies only to civil demands and proceedings."   (ECF No. 13-1 at 24.)   Plaintiffs, citing *Bornstein*, contend that "the grand jury investigation of [] Treem—standing alone—is a written demand for non-monetary relief under the Policy."   However, Plaintiffs' reliance on *Bornstein* is unwarranted insofar as the policy

in that case broadly required the insurer to "defend any proceeding or suit brought by any government regulatory agency seeking nonpecuniary relief." *Bornstein*, 828 F.2d at 244.

Grand jury investigations are criminal proceedings that examine possible crimes and develop evidence not currently available to the Government. They are not, as a whole, "written demands" or "written requests." To the extent the Policy in this case includes coverage for "proceedings," such coverage is explicitly limited to "civil" proceedings. Therefore, because the broad policy in *Bornstein* varies significantly and critically from the Policy in the instant action, and because the Policy's "Claim" definition limits coverage to "civil" proceedings, the grand jury's criminal investigation of Treem, as a whole, does not constitute a "Claim" under the Policy.

2. The Individual Communications: The Ravenell Conflict Letter, The Search Warrant, The Target Letter and Target Conflict Letter, The Government's Conflict Communications

Finally, Chubb contends that the Government's communications to Treem in the course of the grand jury investigation do not satisfy the requirements of Section (1)(a) of the Policy's "Claim" definition. (ECF No. 13-1 at 27.) These communications include the following: (1) the Ravenell Conflict Letter; (2) the Search Warrant; (3) the Target Letter and Target Conflict Letter; and (4) the Government's demand that Treem notify other clients of potential conflicts arising from the Target Conflict Letter. The Court need not revisit the reasons articulated above as to why the Search Warrant does not constitute a "Claim" under the Policy. Nevertheless, the remaining communications—the Ravenell Conflict Letter, the Target Letter and Target Conflict Letter, and the Government's demands with respect to other clients of Treem and BGL—fail to trigger coverage under the Policy.

26

Chubb first contends that the Government's communications do not constitute "written demands" or "written requests."   (ECF No. 13-1 at 27–29.)   Plaintiffs, unsurprisingly, argue that these communications are "written demands" or "written requests" for "non-monetary relief." (ECF No. 20-1 at 24–26.)   Although the Court is skeptical that the Government's letters to Treem constitute "demands" or "requests," the Court will assume without deciding that these communications constitute "written demands" or "written requests," and will resolve Chubb's Motion to Dismiss with respect to these communications on separate grounds.

Chubb also contends that because Treem "accede[d]" to the Government's conflict communications, "any costs incurred . . . to comply with" Treem's accession fall outside the Policy's definition of "Loss."   (ECF No. 13-1 at 30.)   Plaintiffs' briefs are unresponsive to this argument.   As noted above, "Loss" is defined in the Policy as "the amount that an Insured becomes legally obligated to pay as a result of any covered Claim, including but not limited to damages . . . , judgments, settlements, pre-judgment and post-judgment interest and Defense Costs."   (ECF No. 13-3 at 5.)   However, the Policy includes a number of items that are explicitly excluded from the definition of "Loss," including "any costs incurred by an Insured . . . to comply with an *agreement to provide* [non-monetary] *relief*."   (*Id.*) (emphasis added).

Here, the costs Plaintiffs incurred from their retention of ethics counsel to advise them with respect to their ethical obligations in light of the Government's conflict communications are squarely and explicitly excluded from the Policy's "Loss" definition.   To the extent the Government's conflict communications "demand" or "request" any sort of "non-monetary relief"—as explained above, the Court is skeptical that they amount to a "demand" or "request"— the costs to retain ethics counsel were not incurred to "defend against" those purported demands

or requests, but rather were incurred to ensure they fully complied with their ethical obligations in a manner satisfactory to the Government.   In Plaintiffs' view, the Government's communications "insist[ed] that [] Treem take measures to address alleged conflicts," which he did by hiring counsel and submitting record testimony in relevant proceedings.   (ECF No. 20-1 at 25.)   In fact, Plaintiffs admit that Treem "prompt[ly] acce[ded] to the Government's instructions" with respect to the conflict communications.   (*Id.*)

There is no indication that Treem has at any point disputed the scope of his ethical obligations or otherwise "defended" against the Government's requests that he comply with those obligations in a satisfactory manner.   Instead, the Government communicated its positions regarding each of Treem's potential conflicts of interest to Treem and BGL, and proposed solutions for the resolution of those conflicts.   Rather than disputing those positions, or otherwise defending against them, Treem's and BGL's retention of ethics counsel served to ensure that they fully complied with their ethical obligations in a manner satisfactory to the Government.   Accordingly, Plaintiffs' costs incurred for their retention of counsel to represent Treem in relation to his ethical obligations do not constitute "Loss" within the meaning of the Policy.

Likewise, any costs incurred from Plaintiffs' ongoing retention of ethics counsel are also excluded from the Policy's "Loss" definition.   In addition to the exclusion explained above, also excluded from "Loss" are "any amount[s] incurred by an Insured in the defense or investigation of any action, proceeding, demand or request *that is not then a Claim even if such matter subsequently gives rise to a Claim*."   (ECF No. 13-3 at 5) (emphasis added).

Any costs incurred by Plaintiffs from their retention of ethics counsel to preemptively advise them with respect to any potential conflicts of interest the Government had yet to identify

or otherwise bring to their attention would not constitute "Loss" because those potential conflicts of interest would not constitute "Claims" at the time the costs were incurred.   Until the Government makes a "written demand" or "written request" for Plaintiffs to take action with respect to any potential conflict of interest, no "Claim" has occurred within the meaning of Section (1)(a) of the Policy.   Furthermore, such potential conflicts of interest would not fall within Sections (1)(b) through (1)(d) of the "Claim" definition.   Therefore, absent any "written demand" or "written request" to take action with respect to potential conflicts of interest, costs related to Plaintiffs' retention of counsel to preemptively address any potential conflict of interest are squarely excluded from the definition of "Loss" under the Policy.

Because the costs incurred by Plaintiffs related to the Partner Claim are not covered "Losses" under the Policy, the Court finds that Chubb owes no obligation to cover Plaintiffs' expenses related to the Partner Claim.   Accordingly, Counts III and IV of Plaintiffs Complaint, which relate to the Partner Claim, fail to state a claim upon which relief may be granted. Therefore, the Court **GRANTS** Chubb's Motion to Dismiss with respect to Counts III and IV of Plaintiffs' Complaint.

### IV.    CONCLUSION

Therefore, for the reasons stated more fully above, the Court **GRANTS** Chubb's Motion to Dismiss.   (ECF No. 13.)   Accordingly, it is **ORDERED** that this civil action is **DISMISSED** and retired from the docket of this Court.   Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 20), and Chubb's Cross-Motion for Summary Judgment, (ECF No. 40), are hereby **DENIED AS MOOT**.[3]   The Court **DIRECTS** the Clerk to remove this matter from the Court's docket.

---

[3] As a final note, although the Court need not reach the parties' briefing as it relates to the pending motions for summary judgment because this case is completely resolved on the basis of Chubb's Motion to Dismiss, the Court

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any

unrepresented party.

ENTER:        December 2, 2021

THOMAS E. JOHNSTON, CHIEF JUDGE

---

must address Plaintiffs' attempt in their Consolidated Reply, (ECF No. 43), to broaden the scope of the instant action to include Treem's indictment. In their Consolidated Reply, Plaintiffs contend—for the first time in this action—that "the Government's December 2020 indictment of [Treem]" is a "written demand[] for non-monetary relief in the form of criminal liability." (ECF No. 43 at 21.) Chubb argues in its Reply in Support of Cross-Motion for Summary Judgment that Plaintiffs' "eleventh-hour shift to a brand new theory, that the Government's December 2020 indictment . . . qualif[ies] as [a] 'written demand[] for non-monetary relief in the form of criminal liability," is impermissible. (ECF No. 46 at 15–16.)

As Chubb correctly points out, Plaintiffs did not allege in their Complaint that the indictment is a covered "Claim" under the Policy. Plaintiffs, likewise, have not amended their Complaint to broaden the scope of the instant action to include the December 2020 indictment. Plaintiffs' inclusion of the December 2020 indictment of Treem in their argument for coverage under the Policy would radically and impermissibly transform the scope of this case, and Plaintiffs are certainly not permitted to make such a profound change with a reply brief. Plaintiffs, upon receipt of the December 2020 indictment, could have moved to amend their Complaint to include their argument that the indictment was a covered "Claim" under the Policy, but they did not. As such, the Court will not consider Plaintiffs' contention that the indictment was a covered "Claim" under the Policy.